UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DEBORAH MICHELE BRANHAM | ) | |
| | ) | |
| v. | ) | No. 3:08-00700 |
| | ) | JUDGE CAMPBELL |
| GANNETT SATELLITE INFORMATION | ) | |
| NETWORK, INC. d/b/a THE DICKSON | ) | |
| HERALD GROUP, A PRODUCT OF | ) | |
| THE TENNESSEAN | ) | |

MEMORANDUM

I.  Introduction

Pending before the Court are Plaintiff's Motion For Partial Summary Judgment (Docket No. 27), and the Defendant's Motion For Summary Judgment (Docket No. 33).

For the reasons set forth herein, Plaintiff's Motion For Partial Summary Judgment (Docket No. 27) is DENIED, and the Defendant's Motion For Summary Judgment (Docket No. 33) is GRANTED.

II.  Factual and Procedural Background

Plaintiff Deborah Michele Branham brought this action against Defendant Gannett Satellite Information Network, Inc. d/b/a The Dickson Herald Group, alleging that the Defendant interfered with the exercise of her rights, and retaliated against her for the exercise of her rights, under the Family Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA").  (Docket No. 1). Plaintiff also alleges that the Defendant violated certain provisions of the regulations implementing the FMLA. (Id.)

Plaintiff was first employed as a receptionist for *The Dickson Herald* from November 21,

2003 to January 15, 2004. (Deposition of Deborah Michele Branham, at 40-41 (Docket No. 31-1)). Plaintiff was terminated from her position for excessive absenteeism. (Id., at 117).

Plaintiff was rehired as a receptionist by *The Dickson Herald* on July 26, 2005, and was terminated on November 24, 2006 for failure to follow the company attendance policy. (Id., at 41-42; Plaintiff's Response To Defendant's Statement Of Undisputed Material Fact, at ¶ 1 (Docket No. 40)(hereinafter "Plaintiff's Response To Facts")). Plaintiff's regularly scheduled work hours were from Monday through Friday, 8:00 a.m. to 5:00 p.m. (Id., at 100; Plaintiff's Response To Facts, at ¶ 2). Plaintiff's immediate supervisor was Tracy Buhler, the Office Manager for *The Dickson Herald*. (Id., at 42; Plaintiff's Response To Facts, at ¶ 3). Ms. Buhler reported to Buddy Hargett, the General Manager for *The Dickson Herald*. (Id., at 42). Mr. Hargett reported to Terri Leifeste, the Vice President of Middle Tennessee Community Newspapers ("MTCN"), which publishes *The Dickson Herald*. (Deposition of Tracy Buhler, at 57 (Docket No. 28-3)).

Plaintiff's absences in November, 2006 began on November 7, 2006. In her deposition, Plaintiff testified that she was absent from her employment on Tuesday, November 7, 2006 because her son was ill, and she called and so advised Ms. Buhler. (Branham Deposition, at 55-56, 147). The next day, Wednesday, November 8, 2006, the Plaintiff sent an email to Ms. Buhler at approximately 9:26 a.m. stating that she would not be in because her son was still sick. (Id., at 59-60, 147; Exhibit 11 to Branham Deposition (Docket No. 31-1, p. 50 of 58); Plaintiff's Response To Facts, at ¶ 5). On Thursday, November 9, 2006, the Plaintiff left a voice mail message for Ms. Buhler stating that she was sick and would be absent from work. (Id., at 62-63, 67, 147-48; Plaintiff's Response To Facts, at ¶ 6). On Friday, November 10, 2006, Plaintiff

2

again left a message for Ms. Buhler that she was sick and would be absent from work. (Id., at 67, 69, 148; Plaintiff's Response To Facts, at ¶ 7).

On Monday, November 13, 2006, Plaintiff's husband left a message for Ms. Buhler that Plaintiff was sick and that he would be taking her to the doctor. (Id., at 78-79, 148; Plaintiff's Response To Facts, at ¶ 8). On that day, Plaintiff was examined by Dr. Pamela Singer at the Dickson Family Medical Group. (Id., at 83, 86, 148; Plaintiff's Response To Facts, at ¶¶ 9, 25). According to the Plaintiff, she told Dr. Singer that she was suffering from migraine headaches, menstrual problems, depression, insomnia, and a stomach virus. (Id., at 84). Dr. Singer found the Plaintiff to be "normal" and expected her to return to full work duty on November 14, 2006. (Id., at 148; Exhibit A To Plaintiff's Motion (Docket No. 28-1); Plaintiff's Response To Facts, at ¶¶ 10, 11, 17). Plaintiff testified that she talked with Ms. Buhler later that day and told her that Dr. Singer had released her to come to work the following day. (Branham Deposition, at 87-88; Plaintiff's Response To Facts, at ¶¶ 12, 13). Plaintiff testified that she also told Ms. Buhler that she wasn't feeling well, and would need to be absent to attend other doctors' appointments during November and December. (Id., at 87-88, 96-97).[1] Plaintiff further testified that Ms. Buhler told her to come in to the office and sign a form for short term disability/FMLA leave. (Id.; Plaintiff's Response To Facts, at ¶ 15). According to the Plaintiff, Ms. Buhler also told her she could do some work from home or after hours to help with the month-end "close-out." (Id., at 89).

The next day, Tuesday, November 14, 2006, Plaintiff did not report to work during her

---

[1] Ms. Buhler testified that she recalled this conversation as having taken place on November 15, 2006. (Buhler Deposition, at 38). For purposes of the Defendant's summary judgment motion, the Court will assume the conversation took place on the date claimed by the Plaintiff.

3

regular shift. (Branham Deposition, at 100-01; Plaintiff's Response To Facts, at ¶ 16). According to Dr. Singer, the Plaintiff was released to return to work on this day. (Exhibit A To Plaintiff's Motion (Docket No. 28-1); Plaintiff's Response To Facts, at ¶¶ 10, 11, 17). The Plaintiff did come into work late at night to complete some paperwork and fill out a medical certification form. (Id., at 100-01, 106, 148-49; Plaintiff's Response To Facts, at ¶ 18).

Plaintiff did not report to work on Wednesday, November 15, 2006, and Thursday, November 16, 2006, but claims to have worked from home on postal reports and subscription issues. (Id., at 101, 149; Plaintiff's Response To Facts, at ¶¶ 20, 21). Ms. Buhler testified in her deposition that she faxed the medical certification form to Dr. Singer's office on November 15, 2006, and due to a malfunction with Dr. Singer's fax machine, had to fax the form again on November 16, 2006. (Buhler Deposition, at 55).

On Friday, November 17, 2006, Plaintiff did not report to work during regular office hours, but states that she worked after hours. (Branham Deposition, at 103, 149; Plaintiff's Response To Facts, at ¶ 24). That same day, according to Ms. Buhler, Dr. Singer's office faxed the completed medical certification form back to Ms. Buhler. (Buhler Deposition, at 55; Plaintiff's Response To Facts, at ¶ 26). Through that form, Dr. Singer indicated that Plaintiff's condition commenced on November 10, 2006, and that she could perform her full duty as of November 14, 2006, and did not require intermittent leave. (Exhibit A To Plaintiff's Motion (Docket No. 28-1); Plaintiff's Response To Facts, at ¶ 27).

On Monday, November 20, 2006, Plaintiff did not report to work or call in to explain her absence. (Id., at 103-04, 149; Plaintiff's Response To Facts, at ¶¶ 28, 29). Ms. Buhler met with MDCN Vice President Terri Leifeste and Human Resources Vice President Kathy Cheatham on

4

that day to discuss Plaintiff's absence. (Plaintiff's Response To Facts, at ¶ 31). Ms. Cheatham advised Ms. Buhler to contact the Plaintiff and let her know that her job would be in jeopardy unless she could produce other medical documents confirming her need to be off. (Plaintiff's Response To Facts, at ¶ 32). Ms. Buhler advised the Plaintiff as she was instructed. (Buhler Deposition, at 58). Plaintiff told Ms. Buhler that the wrong doctor filled out the certification form, and stated that Dr. Koster Peters, her primary care physician at the Dickson Family Medical Group, could provide clarification if Defendant faxed the certification form to him. (Id., at 58-59; Plaintiff's Response To Facts, at ¶ 33). Ms. Buhler advised the Plaintiff to call Kathy Cheatham. (Id., at 60; Deposition of Kathy Cheatham, at 5 (Docket No. 35-2)).

On Tuesday, November 21, 2006, Plaintiff did not report to work. (Branham Deposition, at 149-50; Plaintiff's Response To Facts, at ¶ 34). Plaintiff testified that she spoke with Ms. Cheatham that day, and Ms. Cheatham expressed her concern that it was taking the Plaintiff so long to return a medical certification form to support her absences. (Id., at 110, 156). Also, on November 21, 2006, Ms. Buhler attempted to fax the certification form to Dr. Peters, as requested by Plaintiff, but had problems with the fax machine. (Buhler Deposition, at 60-62). Consequently, Ms. Buhler and Ms. Leifeste decided that Alvin Leifeste, the Circulation Manager for the MTCN group, would take the certification form completed by Dr. Singer to the physicians' office the next day and speak with the doctors in person. (Id., at 62-63; Plaintiff's Response To Facts, at ¶ 37).

On Wednesday, November 22, 2006, Plaintiff did not report to work. (Id., at 111, 150; Plaintiff's Response To Facts, at ¶ 38). That same day, Mr. Leifeste took the form completed by Dr. Singer, as well as a blank certification form, to the offices of Dr. Singer and Dr. Peters at the

5

Dickson Family Medical Group. (Deposition of Alvin Leifeste, at 14-15 (Docket No. 28-5); Exhibit 24 to Branham Deposition (Docket No. 31-1, p. 55 of 58)). Mr. Leifeste spoke with an employee at the physicians' office, Katie Moran, and told her there was a question about the accuracy of the form completed by Dr. Singer, and asked if the doctor would review the form for accuracy, and explained that he had a blank form the doctor could use if the completed form was inaccurate. (Id., at 15-16). Ms. Moran said she would take the form back to the doctor, along with the Plaintiff's medical records, for review. (Id., at 16-17). When Mr. Leifeste suggested that Dr. Peters review the form, Ms. Moran told him that Dr. Peters would not fill out the form because he was not the doctor who had actually seen the Plaintiff. (Id., at 24-26). When she returned from speaking with Dr. Singer, Ms. Moran told Ms. Leifeste that the doctor had looked at the certification form, that it was accurate, and that she did not wish to make any changes. (Id., at 17; Plaintiff's Response To Facts, at ¶ 42).

The next day, Thursday, November 23, 2006, was Thanksgiving Day, and the Defendant's offices were closed. (Branham Deposition, at 113, 150; Plaintiff's Response To Facts, at ¶ 45).

On Friday, November 24, 2006, Plaintiff did not report to work. (Branham Deposition, at 114-15, 150; Plaintiff's Response To Facts, at ¶ 46). Kathy Cheatham spoke with Terri Leifeste by telephone on that day, and they jointly decided to terminate Plaintiff's employment. (Plaintiff's Response To Facts, at ¶ 48). Terri Leifeste called the Plaintiff to advise her of the termination, but could not reach her and left a message for the Plaintiff to call back. (Cheatham Deposition, at 18-20; Deposition of Terri Leifeste, at 22 (Docket No. 35-5)). When the Plaintiff did not call back, Ms. Leifeste directed Ms. Cheatham to draft a termination letter to send to the

6

Plaintiff by registered mail. (Id., at 22).

On Monday, November 27, 2006, Plaintiff did not report to work. (Branham Deposition, at 150; Plaintiff's Response To Facts, at ¶ 50). On that same day, Ms. Cheatham drafted and sent the termination letter, over the signature of General Manager Buddy Hargett, to the Plaintiff by registered mail. (Cheatham Deposition, at 19; Leifeste Deposition, at 23). The termination letter was dated November 24, 2006, the day the termination decision was made, and states that Plaintiff's termination was based on her failure to follow company attendance policy by being absent from work since Dr. Singer released her to work on November 14, 2006. (Cheatham Deposition, at 19; Exhibit 2 to Cheatham Deposition (Docket No. 35-2); Plaintiff's Response To Facts, at ¶ 52).

On Tuesday, November 28, 2006, Plaintiff did not report to work. (Branham Deposition, at 150-51; Plaintiff's Response To Facts, at ¶ 53). The termination letter was mailed at 9:44 a.m. on that same day. (Branham Deposition, at 117, 120; Exhibit 26 to Branham Deposition (Docket No. 31-1, p. 56 of 58); Plaintiff's Response To Facts, at ¶ 55). Plaintiff testified that she spoke on the telephone with Ms. Cheatham, who told her that she had been terminated. (Branham Deposition, at 150-51; Plaintiff's Response To Facts, at ¶ 56).

After 6:00 p.m. that evening, the Defendant received a faxed certification form signed by a nurse practitioner, Cheryl Seefeldt, who worked in that same practice as Dr. Singer and Dr. Peters. (Cheatham Deposition, at 9; Branham Deposition, at 122-23; Exhibit B to Plaintiff's Memorandum (Docket No. 28-2); Plaintiff's Response To Facts, at ¶ 58). Ms. Seefeldt's certification contradicts the certification of Dr. Singer with respect to the duration of the Plaintiff's incapacity. (Plaintiff's Response To Facts, at ¶ 59). According to Nurse Seefeldt,

7

Plaintiff's illness began on May 6, 2006 and was expected to prevent her from returning to work until January 1, 2007. (Id.) However, Plaintiff admits that Dr. Singer was the only health care provider to examine her between November 7, 2006 and November 24, 2006. (Plaintiff's Response To Facts, at ¶ 60; Branham Deposition, at 123-24).

Defendant's Attendance Policy states as follows:

> If you will be absent from work because of illness or other personal circumstances, notify your manager as far in advance as possible. Employees are expected to be punctual in reporting to work. We recognize this may not always be possible due to circumstances beyond your control. Notify your manager if you expect to be late. If advance notification is impossible, discuss the matter with your manager as soon as you arrive at work. Our success is based on the daily contributions of you and your colleagues. Absenteeism or tardiness interferes with your contributions and those of fellow employees and can lead to disciplinary action up to and including dismissal.

(Plaintiff's Response To Facts, at ¶ 57).

III. Analysis

A. The Standards for Considering Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. Hamilton v. General Electric Co., 556 F.3d 428, 433 (6th Cir. 2009); Van Gorder v. Grand Trunk Western Railroad, Inc., 509 F.3d 265, 268 (6th Cir. 2007).

In order to defeat a summary judgment motion, the nonmoving party must provide more than a scintilla of evidence; that is, the nonmoving party must present evidence sufficient to

permit a reasonable jury to find in its favor. Van Gorder, 509 F.3d at 268. Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial. Id.

B. The Interference Claim

Under the FMLA, qualifying employees are entitled to take up to twelve weeks of unpaid leave in a year when the leave is taken for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §§ 2612(a)(1)(D). Edgar v. JAC Products, Inc., 443 F.3d 501, 506 (6th Cir. 2006). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves-(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); Id.

There are two theories of recovery available under the FMLA: the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2). Wysong v. Dow Chemical Co., 503 F.3d 441, 446 (6th Cir. 2007). The interference theory is based on the language in Section 2615(a)(1), which specifically prohibits qualifying employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under th[e] [FMLA]." 29 U.S.C. § 2615(a)(1). Under the interference theory, the issue is simply whether the employer provided its employee with the entitlements set forth in the FMLA. Arban v. West Pub. Corp., 345 F.3d 390, 401 (6th Cir. 2003). The employer's intent is not relevant is considering an interference claim. Edgar, 443 F.3d at 508.

9

To establish a claim under the interference theory, the employee must prove, by a preponderance of the evidence, the following elements: (1) she is an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which she was entitled or interfered with FMLA rights to which she was entitled. Wysong, 503 F.3d at 447; Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir.2003).

The Defendant argues that Plaintiff is unable to show that she was entitled to leave under the FMLA, or that she was denied a benefit to which she was entitled. Specifically, the Defendant contends that Plaintiff cannot show she suffered from a "serious health condition" entitling her to FMLA leave during the applicable period.

The regulations define "a serious health condition involving continuing treatment by a health care provider"[2] as including a period of incapacity of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, and that also involves:

> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i). The regulations define "incapacity" as the "inability to work,

---

[2] Plaintiff does not contend that she received "inpatient care" during the applicable period. 29 U.S.C. § 2611(11)(A).

10

attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom." 29 C.F.R. § 825.114(a)(1).

The employer may require an employee to provide a written certification issued by the health care provider of the eligible employee, and the certification is to be provided "in a timely manner." 29 U.S.C. § 2613(a). The regulations provide that when the leave is foreseeable, the employee should provide the medical certification before the leave begins. 29 C.F.R. § 825.305(b). When this is not possible, "the employee must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." Id.

Plaintiff argues that her absences were due to a serious health condition, as evidenced by the medical certification of Nurse Practitioner Seefeldt. She contends that the Defendant was required to hold her job open until receipt of Nurse Seefeldt's certification because Section 825.305(b) imposes a 15-day waiting period after the employer requests a medical certification. The Defendant argues that once it received Dr. Singer's certification clearing the Plaintiff to return to work, the 15-day period imposed by the regulations for receipt of a certification no longer applied.

According to the Plaintiff, she told Ms. Buhler on November 13, 2006 that she needed to take leave during November and December, and Ms. Buhler told her that she needed to come in and sign the paperwork to take short-term disability or FMLA leave. Thus, Plaintiff presumably made the leave request, and the Defendant made the certification request, on November 13, 2006 – the date upon which the 15-day period presumably began.

11

The Defendant received a "requested certification," as contemplated by Section 825.305(b), four days later from Dr. Singer, the physician who had performed the examination of the Plaintiff. The certification did not support Plaintiff's request for a two-month leave. Instead, it cleared the Plaintiff to return to work on November 14, 2006. The Defendant had no reason, other than Plaintiff's disagreement with the doctor's findings, to question the medical opinion that the Plaintiff could return to work. Nonetheless, at Plaintiff's insistence, a representative of the Defendant confirmed that Dr. Singer did not wish to change her opinion on the certification form she had signed, and that Dr. Peters would not provide an opinion because he had not actually examined the Plaintiff. For her part, the Plaintiff did not even see a doctor during the period from November 14 to November 24, 2006, nor provide the Defendant with a certification calling into question the one provided by Dr. Singer. Although the Plaintiff eventually saw and obtained a second, contradictory certification from a nurse practitioner who worked for Dr. Singer and Dr. Peters, it was not received by the Defendant until after business hours on November 28, 2006 – 14 days after she had been cleared to work, and on the same day she had been told of the termination decision.

Under these circumstances, the Court is not persuaded that the Defendant was required to delay its termination decision until receipt of the second, unanticipated medical certification. Several courts, including the Sixth Circuit, have held that in denying FMLA leave, an employer is entitled to rely on a "negative certification," a medical certification that the employee's condition does not require the employee to miss work:

> . . . the 'employer does not violate the FMLA by relying upon [a negative] certification in the absence of some overriding medical evidence.' . . . [T]hat medical evidence should come from the employee in time to save his job, not during a subsequent law suit.'

12

Nawrocki v. United Methodist Retirement Communities, Inc., 174 Fed. Appx. 334, 338 (6th Cir. March 31, 2006)(quoting Stoops v. One Call Communications, Inc., 141 F.3d 309 (7th Cir. 1998)). See also Allen v. Progress Energy, Inc., 2009 WL 425966, at *8 (M.D. Fla. Feb. 20, 2009)(The 15-day period "applies in cases where the employer denies FMLA leave based on the employee's failure to return documentation, not in cases where the employee submits documentation indicating that she is not entitled to leave.")

As the Plaintiff cannot show that she was entitled to FMLA leave during the applicable period, she has not established a claim under the interference theory, and the Defendant is entitled to judgment on this claim.[3]

C. The Retaliation Claim

The FMLA provides that: "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). The retaliation theory of recovery imposes liability on an employer who acts against an employee because the employee invoked his or her FMLA rights. Edgar, 443 F.3d at 508. This prohibition includes retaliatory discharge of the employee for taking FMLA leave. Arban v. West Publishing Corp., 345 F.3d at 403.

To establish a prima facie case of retaliation, a plaintiff must show the following by a preponderance of the evidence: (1) the plaintiff engaged in an activity protected by the FMLA; (2) the exercise of the plaintiff's protected rights was known to the defendant; (3) the defendant

---

[3] Plaintiff makes numerous other arguments that the Defendant violated various FMLA regulations. Plaintiff cannot show she was prejudiced by any such claimed violations, however, as she has not shown that she was entitled to FMLA leave during the applicable period. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002); Edgar, 443 F.3d at 508 (Employee seeking relief for FMLA violation must show he suffered prejudice).

13

thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Arban, 345 F.3d at 404. In considering a retaliation claim, as opposed to an interference claim, the employer's motive is an integral part of the analysis. Edgar, 443 F.3d at 508. If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employer's action. Id. If the defendant carries this burden, the plaintiff must show that the legitimate reason offered by the defendant is pretextual. Id.

As explained above, the Plaintiff has not established that she was entitled to leave under the FMLA during the applicable period. Therefore, she cannot establish that she was discharged in retaliation for taking FMLA leave, and the Defendant is entitled to judgment on Plaintiff's retaliation claim. See, e.g., Morris v. Family Dollar Stores Of Ohio, Inc., 2009 WL 899894 (6th Cir. March 31, 2009); Nawrocki, 174 Fed. Appx. at 339.

## IV. Conclusion

For the reasons set forth herein, the Plaintiff's motion for partial summary judgment is denied, and the Defendant's motion for summary judgment is granted, and this case is dismissed.

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

14